**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | § | |
|---|---|---|
| EPIC IP LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 1:18-141-WCB |
| | § | |
| BACKBLAZE, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This is a patent infringement action brought by plaintiff Epic IP LLC against defendant Backblaze, Inc.  Before the Court is Backblaze's motion to dismiss the complaint based on patent ineligibility under 35 U.S.C. § 101.  Following briefing and oral argument before the Court on November 16, 2018, the Court GRANTS the motion and dismisses the complaint with prejudice.  A judgment will be separately entered terminating this action.

## BACKGROUND

Epic owns U.S. Patent No. 6,434,599 ("the '599 patent"), which is entitled "Method and Apparatus for On-Line Chatting."  The patent is directed to the formation of an Internet chat session in which on-line users who visit an information site can establish a separate chat session with a sub-group of those visiting the site.  Epic has asserted five of the twenty-five claims against Backblaze.  The asserted claims are claims 1-4 and 19.  The first four claims are method claims; the last is an apparatus claim to an "information server" that enables the formation of a chat session unaffiliated with a pre-established chat room.

Claim 1 of the '599 patent provides as follows:

1.  An on-line chatting method comprising:
    facilitating visit [sic: a visit] by a first on-line user to an information page of an information site;
    facilitating dynamic formation of a chat session unaffiliated with any pre-established chat room for said first on-line user and a second on-line user to chat with each other; and
    facilitating said chat session through which said first and second on-line users chat with each other.

Claim 2 depends from claim 1 and adds that "said facilitating of dynamic formation of a chat session unaffiliated with any pre-established chat room comprises providing a mechanism to said first on-line user to initiate formation of said unaffiliated chat session."

Claim 3 depends from claim 2 and adds that "said provision of a mechanism to said first on-line user to initiate formation of said unaffiliated chat session comprises providing a selectable icon for said first on-line user to indicate the first on-line user's desire to chat with another non-particularized on-line user."

Claim 4 depends from claim 3 and adds that "said provision of a mechanism to said first on-line user to initiate formation of said unaffiliated chat session further comprises providing one or more dialog panels for said first on-line user to specific [sic: specify] one or more descriptive characteristics of said first on-line user."

Claim 19 provides as follows:

19.  An information server comprising:
    a plurality of information pages to be selectively provided to a client computer responsive to the client computer's request; and
    a first script/applet to be included with a responsive information page to enable the client computer to initiate dynamic formation of a chat session unaffiliated with any pre-established chat room for a user of the client computer to chat with a second user of interest, also visiting the information server.

On January 24, 2018, Epic filed separate actions against three defendants: AutoNation, Inc. (Case No. 1:18-cv-139), Blue Jeans Network, Inc. (Case No. 1:18-cv-140), and Backblaze,

Inc. (Case No. 1:18-cv-141). The actions against Blue Jeans Network and AutoNation, Inc., were subsequently dismissed following settlement.

Backblaze has now sought dismissal of the action against it under Federal Rule of Civil Procedure 12(b)(6) on the ground that the asserted claims of the '599 patent are directed to abstract ideas and are not eligible for patenting in light of section 101 of the Patent Act. For the reasons set forth in detail below, the Court agrees with Backblaze that the asserted claims of the '599 patent are drawn to abstract ideas and are not patent-eligible.

## DISCUSSION

The framework for analyzing the issue of patentable subject matter under 35 U.S.C. § 101 is well settled. The Supreme Court's decision in *Alice Corp. v. CLS Bank International*, 134 S. Ct. 2347 (2014), established a two-step test for determining whether a patent is directed to an unpatentable idea. First, the court must determine "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. 134 S. Ct. at 2355. Second, if the claims are directed to an abstract idea, the court must decide whether there is an "inventive concept" in the claims at issue. The Supreme Court characterized an "inventive concept" as "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself'"; the presence of an "inventive concept," the Court explained, is enough to "'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.* 566 U.S. 66, 72–73, 78 (2012)).

The first step of the two-step analysis requires the court to examine the "focus" of the claim, i.e., its "character as a whole," in order to determine whether the claim is directed to an abstract idea. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018); *Internet*

*Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). The second step, if reached, requires the court to "look[] more precisely at what the claim elements add—specifically, whether, in the Supreme Court's terms, they identify an '"inventive concept"' in the application of the ineligible matter to which (by assumption at step two) the claim is directed." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations omitted).

## I. Abstract Idea

### A. Governing Principles

Defining an "abstract idea," as that term is used in section 101 jurisprudence, has not proved to be a simple task. Neither the Supreme Court nor the Federal Circuit has ventured a single, comprehensive definition. *See Alice*, 134 S. Ct. at 2357 ("[W]e need not labor to delimit the precise contours of the 'abstract ideas' category in this case."); *Bilski v. Kappos*, 561 U.S. 593, 621 (2010) (Stevens, J., concurring in the judgment) ("The Court . . . never provides a satisfying account of what constitutes an abstract idea."); *Elec. Power Grp.,* 830 F.3d at 1353 ("We need not define the outer limits of 'abstract idea'"); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) ("The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry. . . . Rather, both this court and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."). Rather than a unitary test, what has emerged from the section 101 cases is a group of related principles that can be applied in gauging whether or not a patent claim is directed to an abstract idea. They include the following:

First, the courts have characterized "method[s] of organizing human activity" as abstract. *See Alice*, 134 S. Ct. at 2356; *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir.

2018).  In particular, the courts have identified fundamental economic practices that have long been prevalent in our system of commerce as abstract ideas.  Applying that principle in the field of computers and telecommunications, the courts have held that claims directed to simply implementing such economic practices on a computer are not patent-eligible.  *See Alice*, 134 S. Ct. at 2355–57; *Bilski*, 561 U.S. at 611; *BSG*, 899 F.3d at 1285 ("If a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one" of *Alice*.).  Nor does the fact that a computer can perform such operations more rapidly and efficiently make an abstract idea any less abstract or any more patent-eligible.  *See, e.g., RecogniCorp. LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis.").

Second, as applied to computer applications, the courts have looked to whether the claim in question is directed to an improvement in computer technology as opposed to simply providing for the use of a computer to perform "economic or other tasks for which a computer is used in its ordinary capacity."  *Enfish,* 822 F.3d at 1336.  Where the claims at issue provide for an improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible.  *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018) (methods for making electronic spreadsheets more

accessible); *Core Wireless Licensing S.A.R.L. v. LG Elec., Inc.*, 880 F.3d 1356, 1361–63 (Fed. Cir. 2018) (improved display devices); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018) (novel method of virus scanning); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017) (improved computer memory system).

Numerous Federal Circuit decisions have drawn the distinction between patent-eligible claims that "are directed to a specific improvement in the capabilities of computing devices," as opposed to "'a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Core Wireless*, 880 F.3d at 1361–62 (quoting *Enfish*, 822 F.3d at 1336); *see also McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014). This principle has sometimes been described as requiring, in the computer field, a "technological solution to a technological problem specific to computer networks." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("the claims are not directed to a solution to a 'technological problem'").

Third, in determining whether a particular claim is directed to an abstract idea, courts have focused on whether the claim is purely functional in nature rather than containing the specificity necessary to recite how the claimed function is achieved. The Federal Circuit has focused on the problem of functional claiming in a number of recent section 101 decisions. In those cases, the Federal Circuit, treating the term "abstract" as an antonym of "concrete" or "specific," has analyzed whether the claims before it are sufficiently concrete or specific to be directed to a patent-eligible process rather than a patent-ineligible result. For example, in *SAP America*, 898 F.3d at 1167, the court asked whether the claim had "the specificity required to

transform [it] from one claiming only a result to one claiming a way of achieving it." To answer that question, the Federal Circuit has directed courts to "look to whether the claims focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *McRO*, 837 F.3d at 1314 ("We therefore look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoked generic processes and machinery."). Therefore, the question in such cases is "whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d at 1326.

As Judge Chen noted for the Federal Circuit in *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018), the focus on functionality as a measure of patent eligibility has a long and notable pedigree. Judge Chen cited *Wyeth v. Stone*, 30 F. Cas. 723 (C.C.D. Mass. 1840), as an example of an early expression of some of the policy concerns that underlie the issue of patent eligibility. In that case, Justice Story, riding circuit, presided over a patent infringement suit involving two claims. In one, the patentee claimed a particular apparatus and machinery to cut ice, and in the other the patentee claimed "an exclusive title to the art of cutting ice by means of any power, other than human power." *Id.* at 727. Justice Story ruled that the second claim was "utterly unmaintainable," because it was "a claim for an art or principle in the abstract, and not for any particular method or machinery, by which ice is to be cut." *Id.*

In *Interval Licensing*, the Federal Circuit also pointed to the Supreme Court's nineteenth century decisions in *O'Reilly v. Morse*, 56 U.S. (15 How.) 62 (1853), and *Le Roy v. Tatham*, 55

U.S. (14 How.) 156 (1853), which make similar observations.  *See Interval Licensing*, 896 F.3d at 1343; *see also Mayo*, 566 U.S. at 70.  Importantly, in both of those older cases the Court emphasized that a claim to a result, however achieved, is not patentable, and that allowing such a patent would have impermissible preemptive effects, which is the same issue that the Supreme Court has noted in section 101 cases as driving the Court's restrictions on claims to abstract ideas.  *Compare Le Roy*, 55 U.S. (14 How.) at 175 ("A principle, in the abstract, . . . cannot be patented. . . .  A patent is not good for an effect, or the result of a certain process, as that would prohibit all other persons from making the same thing by any means whatsoever."), *with Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 566 U.S. at 85 ("We have described the concern that drives this exclusionary principle as one of pre-emption. . . .  We have 'repeatedly emphasized this . . . concern that patent laws not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity.")).  Based on that analysis and other Federal Circuit decisions to the same effect, the Federal Circuit in *Interval Licensing* held the representative claim before it, which was directed to what was called an "attention manager" in a computer readable medium, to be patent-ineligible.  That was so, the court explained, because the claim recited a "broad, result-oriented" structure, and because "[i]nstead of claiming a solution for producing [a] result, the claim in effect encompasses all solutions."  896 F.3d at 1345.

Other cases from the Federal Circuit have employed the same analysis and applied it to hold claims ineligible under section 101.  *See Two-Way Media,* 874 F.3d at 1337 ("The claim [before the court] requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way."); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("IV argues that the claims set forth a unique solution to a problem

with contemporary XML documents. . . . But the claims do not recite particular features to yield these advantages. Although the claims purport to modify the underlying XML document in response to modifications made in the dynamic document, this merely reiterates the patent's stated goal itself. . . . Indeed, the claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more."); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) ("The patents claim systems including menus with particular features. They do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems."); *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) ("While independent claim 1 refers to general components such as a cellular telephone, a graphical user interface, and a downloadable application, the claimed invention is entirely functional in nature. It recites software in the form of 'an application configured for execution by the wireless cellular telephone device' that performs three functions . . . . There is nothing in claim 1 that is directed to *how* to implement out-of-region broadcasting on a cellular telephone. Rather, the claim is drawn to the idea itself."); *McRO,* 837 F.3d at 1314 ("The abstract idea exception has been applied to prevent patenting of claims that abstractly cover results where 'it matters not by what process or machinery the result is accomplished."); *Elec. Power Grp.*, 830 F.3d at 1356 (referring to the "important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them" and quoting the district court's observation that "'there is a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general.'"); *In re TLI Commc'ns LLC Patent*

*Litig.*, 823 F.3d at 615 ("vague, functional descriptions of server components are insufficient to transform the abstract idea into a patent-eligible invention").

**B. Applying Those Principles to This Case**

Each of the above-listed principles that guide the courts' abstract idea inquiries points to the conclusion that the asserted claims of the '599 patent are directed to abstract ideas. First, the claims are directed to a method of organizing human activity. Second, the claims do not recite an improvement in computer technology. Third, the claims are functional in nature; they recite what the objective of the invention is, but not how that objective is to be accomplished. These points are addressed in more detail below.

Asserted claims 1-4 and 19 of the '599 patent are directed to the idea of a "chat session" for users of the Internet. More particularly, the idea underlying the claims is to provide an Internet user the ability to visit a website and then form a group from among those visiting the website to conduct a "chat" independent of the website. That idea can be expressed at several different levels of generality: (1) as the idea of individuals getting together to communicate; (2) as the idea of individuals getting together to communicate over the Internet; or (3) as the idea of individuals getting together to communicate over the Internet by forming a sub-group from the group of individuals visiting a website.

The idea of individuals getting together to communicate is plainly abstract in the sense in which that term has been used in cases addressing the issue of patent eligibility: it is a commonplace occurrence with long historical (indeed, pre-historical) roots. The idea of a sub-group of persons with particular shared interests forming a sub-group for communication is also commonplace in everyday life.

Epic argues that the invention is not drawn to an abstract idea because the activity takes place over the Internet. However, limiting the interpersonal contacts to communications over the Internet does not make the idea any less abstract; the Federal Circuit has made clear that conducting a commonplace activity over the Internet does not avoid the problem of abstractness. *See Ultramercial*, 772 F.3d at 716 ("The claims' invocation of the Internet . . . adds no inventive concept."); *see also BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) ("An abstract idea on an Internet computer network or on a generic computer is still an abstract idea.") (citation and quotation omitted); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (a method of verifying the validity of credit card transactions over the Internet held patent-ineligible as directed to an abstract idea); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (holding that a claim directed to guaranteeing a party's performance in an Internet transaction was directed to an abstract idea).

Epic further argues that the claims are not drawn to an abstract idea because the invention entails more than simply setting up a chat room on the Internet. The novelty, according to Epic, is that the invention provides for individuals who are visiting the same website to initiate private chats with one another, separate from the website that the individuals initially visited. The problem, however, is that the idea of a chat session separate from the original website is not an invention; it is a concept. The asserted claims of the '599 patent recite the concept, but not the way to implement it.

Claim 1 is the worst offender. It is wholly devoid of concreteness. It recites an "on-line chatting method" comprising three steps: "facilitating visit [sic] by an on-line user to an information site"; "facilitating the dynamic formation of a chat session, unaffiliated with any pre-established chat room," between the first on-line user and a second on-line user to chat with each

other; and "facilitating said chat session through which said first and second on-line users chat with each other." Those steps are just the barebones descriptions of a result. The claim contains no description of any mechanism by which that result is obtained. To use the words of the Federal Circuit in *RecogniCorp*, claim 1 of the '599 patent is not directed to "a specific means or method for improving technology," but is "simply directed to an abstract end-result." 855 F.3d at 1326 (internal quotations and citation omitted). The claim is thus clearly directed to an abstract idea.

Independent claim 19 contains nothing of substance beyond what is contained in claim 1, and thus there is no difference between them for section 101 purposes. *See Alice*, 134 S. Ct. at 2360 ("The system claims are no different from the method claims in substance. The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea."). Claim 19 recites an "information server" comprising information pages that can be accessed by a client computer, with a "script/applet" included with each information page. The provision of a generic "information page" to a user is a necessary first step in forming any chat session, and the generic "script/applet" that is included in that page is simply a means of enabling the user to initiate formation of the chat session. The specification describes that process as "conventional." *See* '599 patent, col. 5, ll. 38-41 ("Information server **404** performs is [sic: its] conventional function of responding to visiting users, and providing the visiting users with requested ones of information pages **118** (including applicable ones of associated scripts/applets **406**.)). The specification makes clear that the term "script/applet" is not a reference to a specific device unique to this patent, but is simply a generic term for any mechanism by which the user can communicate with the server, such as to initiate a chat session or provide a description of interest

characteristics of the user.  *See* '599 patent, col. 5, ll. 27-30, 45-50, 56-63; *id.*, col. 5, line 63, through col. 6, line 22; *id.*, col. 6, line 46, through col. 7, line 45.  Like claim 1, claim 19 thus recites a result, not a specific means for achieving that result.

Claim 2, which depends from claim 1, simply adds a reference to providing a generic "mechanism to said first on-line user to initiate said unaffiliated chat session."  Since the process of facilitating a visit by a user to an information site and facilitating the formation of a chat session necessarily contemplates some mechanism by which the user can communicate his desire to visit the site and join a chat session, claim 2 adds nothing of substance to independent claim 1.

Claim 3, which depends from claim 2, adds a "selectable icon for said first on-line user to indicate the first on-line user's desire to chat with another non-particularized on-line user."  The few references in the specification to a "user selectable icon" make clear that the icon is merely a generic description of a mechanism displayed to the user through which the user can indicate his desire to enter a chat session.  *See* '599 patent, col. 5, ll. 45-54; *id.*, col. 6, ll. 46-54; *see also Internet Patents*, 790 F.3d at 1348 (furnishing icons of a web page with a browser having Back and Forward navigation functions characterized as conventional).  That claim, too, adds no specificity to the putative invention of claim 1.

Claim 4, which depends from claim 3, adds a mechanism, referred to as "one or more dialog panels" for the first on-line user "to specific [sic: specify] one or more descriptive characteristics of said first on-line user."  The specification makes clear that the "dialog panel" is merely a generic means for the user to identify characteristics that may be pertinent to the nature of the chat session in which he elects to engage.  *See* '599 patent, col. 6, line 66, through col. 7, line 16.  That feature, like the additional features recited in claims 2 and 3, does not add specificity to the claimed invention.  Formation of a separate chat session among persons sharing

an interest in chatting necessarily requires a means for them to indicate their interest in doing so and naturally requires a means for them to communicate information that would induce others to join such a chat session. Thus, none of the dependent claims overcomes the abstractness of claim 1.

In sum, under governing Federal Circuit precedent, claims 1 and 19 are so general in nature that they are clearly directed to abstract ideas. Dependent claims 2 and 3 add nothing more concrete, as they simply provide an unspecified mechanism by which the user can communicate with the information server. And dependent claim 4 merely provides a means for the user to communicate characteristics that form the basis for generating a chat session with other on-line users. Each of those additional features simply refers to the mechanism by which the user communicates his desires to the system—mechanisms that are implicit in claims 1 and 19 and add no more specificity to the patent claims.

## C. Epic's Arguments

**1.** Epic argues that its patent "address[es] a specific improvement to solve a problem with implementing on-line chat sessions." Dkt. No. 27, at 13. The problem with prior art chat rooms, according to Epic, is that they "were pre-established and required registration." *Id.* As explained in the specification of the '599 patent, "a need exists to provide on-line users with enhanced [sic: an enhanced] chatting experience that is more closely related to their real world experience," '599 patent, col. 1, ll. 55-57. That problem was solved, according to Epic, "through allowing the dynamic formation of a chat session unaffiliated with any pre-established chat sessions using scripts/applets included in information pages so that a user of the information website can chat with other users." Dkt. No. 27, at 13.

That characterization of the problem and its solution is simply saying that the problem was that chat sessions were restricted to pre-established chat rooms, rather than being initiated by individuals interested in chatting about a particular subject, while the solution to the problem was to allow individuals to initiate chat sessions without the constraints of a pre-existing chatroom. But that is not a description of the solution to the problem; it is just a description of the problem and an announcement that it has been solved. Nothing in the claims explains *how* the solution is effectuated.

In the case of claim 1, the proposed "solution" is simply to "facilitate" the establishment of independent chat sessions, which is no solution at all. In the case of dependent claims 2 and 3, the purported solution is the same, with the inclusion of necessarily inherent features of a generic device to initiate the formation of such a session and to indicate a desire to chat with another participant. In the case of claim 4, the additional step is simply a generic device by which the user can specify one or more descriptive characteristics to facilitate the formation of a chat session among persons sharing an interest in chatting. In substance, claim 19 merely incorporates the limitations of the first two claims in apparatus form, referring to the mechanism on an information website for initiating the formation of a chat session by use of the generic term "script/applets." Nothing in independent claims 1 and 19, or in dependent claims 2 through 4, offers a specific "solution" to the problem that Epic describes, as opposed to simply announcing that the solution to the problem of not having a way for on-line users to initiate their own chatroom sessions is to enable on-line users to initiate their own chatrooms.

**2.** Epic next contends that the asserted claims of the '599 patent "are directed to improved computer functionality" and are "rooted in a particular computer technology." Dkt. No. 27, at 11–12. That argument, however, misses the point of the cases that find improvements

in computer technology to be non-abstract. That line of cases addresses technological improvements in the way the computer systems operate, not innovations that happen to employ computers. The cases on which Epic relies illustrate this distinction.

Epic places particularly heavy reliance on *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018). Contrary to Epic's contention, that case demonstrates why Epic's position with respect to the "computer technology" argument is flawed. Representative claim 1 in *Finjan* was directed to a novel type of virus scan for computers. As construed, the claim recited a virus screening program that would identify suspicious code in an executable application program and would attach a security profile to the application program so that the recipient of the program could decide whether to access the program. Importantly, the claimed invention employed a novel "behavior-based" approach to virus scanning, rather than the conventional "code-matching" approach. The behavior-based approach involved determining whether an application was potentially dangerous by examining whether the application performs potentially dangerous or unwanted operations, unlike the code-matching approach, which merely determined whether the application's code matched previously known viruses. Based on that analysis, the court concluded that the claimed method "employs a new kind of file that enables a computer security system to do things it could not do before. . . . The asserted claims are therefore directed to a non-abstract improvement in computer functionality, rather than the abstract idea of computer security writ large." *Id.* at 1305.

The facts of *Finjan* make it clear how different that case is from this one. The invention in *Finjan* solved a technological problem in a technological manner, by fashioning a new way of conducting virus scans. The claims in this case, by contrast, involve no improvements to the operation of computers themselves, but only an arguably new use to which conventional

computer components can be put. The specification of the '599 patent repeatedly emphasizes that the invention involves only conventional computer and communications components. The only thing that is novel is the use to which those components are put. Under the Federal Circuit cases dealing with non-abstract improvements to computer functionality, that is not enough.

In the context of computer-related technology, the Federal Circuit has repeatedly distinguished, for section 101 purposes, between inventions that are directed to specific improvements to computer functionality and those that are not. *See Enfish,* 822 F.3d at 1335 ("[W]e find it relevant to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea"); *see also Visual Memory*, 867 F.3d at 1260 ("The claims in [*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Assn.*, 776 F.3d 1343 (Fed. Cir. 2014)] and [*In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016)] were not directed to an improvement in computer functionality, which separates the claims in those cases from the claims in the current case"); *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017) ("[T]he claims are not focused on *how* usage of the XML tags alters the database in a way that leads to an improvement in the technology of computer databases"). The Federal Circuit has characterized the principle underlying that distinction as embodying a requirement that a patent be directed to "specific technologic modifications to solve a problem or improve the functioning of a known system." *Trading Techs. Int'l, Inc. v. CQG, INC.*, 675 F. App'x 1001, 1004–05 (Fed. Cir. 2017).

The Federal Circuit's decision in *Enfish* identified the kinds of inventions that qualify as non-abstract improvements in computer-related technology, "such as a chip architecture, an LED display, and the like." The claims in *Enfish* involved a self-referential table for a computer database; the court explained that in light of that technological advance, "the plain focus of the

claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." 822 F.3d at 1336. The self-referential table resulted in faster searching and more effective data storage, features that the court held were not abstract.

Other Federal Circuit cases have identified similar technological innovations as non-abstract. For example, in *McRO, Inc. v. Bandai Namco Games America Inc.*, *supra*, the court rejected an argument that claims directed to computer generation of facial expressions and lip movements on three-dimensional animated characters were ineligible for patenting. The claimed computerized animation process, the court explained, was entirely different from the process employed by human animators, 837 F.3d at 1314. Considered as a whole, the court concluded, the invention was "directed to a patentable, technological improvement over the existing, manual 3-D animation techniques" and achieved "an improved technological result." *Id.* at 1316.

The Federal Circuit's decision in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), provides another example of the distinction that the court has drawn between, on the one hand, abstract ideas implemented on computers by the use of conventional computer functionality, and on the other hand, solutions that are based on an improvement in the way computers and networks perform. In that case, the claims were drawn to an invention that would solve the problem of visitors to a website being transported to a different website upon activating a hyperlink, such as an advertisement. The solution set forth in the claims was to create a hybrid web page that would merge content associated with the third-party's products with the elements of the host's website. That solution, the court explained, was "rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257.

Epic's claims clearly do not fall within the scope of that line of cases. Epic's claims are not directed to an improvement in the operation of computers or computer networks. The specification states on several occasions that merely conventional computer and network components are used to implement the inventions. *See* '599 patent, col. 3, ll. 41-48 (referring to computer components "known in the art," networking equipment available from identified suppliers, and "the well known Internet"); *id.*, col. 3, ll. 53-60 (referring to computer servers available from identified suppliers and information pages that represent "a broad range of textual and multi-media data embodied in any number of known organizational formats"); *id.*, col. 3, line 61, through col. 4, line 12 (referring to client computers as representing "a broad range of computers known in the art . . . equipped with proper communication or networking equipment, as well as operating systems and other software," available from identified providers); *id.*, col. 5, ll. 31-44 (referring to an operating system, available from identified suppliers, that performs its conventional functions of managing the information site and responding to visiting users with requested information pages and the associated scripts/applets). The specification thus makes it clear that the claims do not recite novel computer technology, but instead use conventional technology in a conventional manner.

**3.** In a series of cases, the Federal Circuit has found claims directed to specific user interfaces in computer-related inventions to be patent-eligible. At the hearing on the motion to dismiss, counsel for Epic argued that this line of cases provides direct support for Epic's argument that the asserted claims of the '599 patent are not directed to an abstract idea. The Court disagrees. The "user interface" cases on which Epic relies all involve improvements in computer technology, not simply the use of a conventional computer for a new purpose.

In *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), for example, the claims at issue were related to "improved display interfaces, particularly for electronic devices with small screens." *Id.* at 1359. The court held that, as in the case of claims directed to an improvement in computer functionality, the asserted claims were directed to "an improved user interface for computing devices." *Id.* at 1362. As opposed to prior art interfaces that "required users to drill down through many layers to get to desired data or functionality," the court found that the invention "improve[d] the efficiency of using the electronic device by bringing together 'a limited list of common functions and commonly accessed stored data.'" *Id.* at 1363.

The *Core Wireless* court emphasized that the claims at issue in that case were directed to "a particular manner of summarizing and presenting information in electronic devices." *Id.* at 1362. The claimed manner of summarizing and presenting information included limitations on the data listed in the application summary window, restraints on the type of data that can be displayed in the summary window, and the particular state in which device applications must exist. *Id.* at 1362–63. Based on that analysis, the court found the claims patent-eligible. The court explained that "[l]ike the improved system[] claimed in *Enfish* . . . these claims recite a specific improvement over prior systems, resulting in an improved user interface for electronic devices." *Id.* at 1363.

Similarly, in *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018), most of the claims before the court were directed to a specific method of enabling a user to navigate through three-dimensional electronic spreadsheets. The court held that those claims were not directed to an abstract idea. Compared to the prior art, which undermined the effectiveness of the computer in presenting electronic spreadsheets, those claims in the *Data*

*Engine* case were directed to an interface that took the form of notebook tabs, which allowed users easy and intuitive access to the electronic spreadsheet material. As the *Data Engine* court explained, the improvement "allowed computers, for the first time, to provide rapid access to and processing of information in different spreadsheets." *Id.* at 1008.

The court in *Data Engine* noted that representative claim 12 of one of the patents in suit was "directed to more than a generic or abstract idea[,] as it claim[ed] a particular manner of navigating three-dimensional spreadsheets, implementing an improvement in electronic spreadsheet functionality." *Id.* at 1011. However, the court distinguished that claim from claim 1 of another one of the patents in suit, which recited an automated method of tracking modifications across multiple versions of an electronic spreadsheet. The court found that claim to be directed to an abstract idea. That claim, the court found, recited a more generic implementation of a user interface. *See id.* at 1012 ("[I]t generically recites 'associating each of the cell matrices with a user-settable page identifier' and does not recite the specific implementation of a notebook tab interface") (citation omitted). Thus, the court found that claim 1 was "not limited to the specific technical solution and improvement in electronic spreadsheet functionality that rendered representative claim 12 . . . patent eligible." *Id.* Instead, the court observed, claim 1 "covers any means for identifying electronic spreadsheet pages," and as such was drawn to an abstract idea. *Id.*

The court in *Data Engine* also distinguished the Federal Circuit's earlier decision in *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315 (Fed. Cir. 2017). The patent at issue in that case was directed to "methods and apparatuses that use an index to locate desired information in a computer database." *Id.* at 1325. The court held that the invention was drawn to the abstract idea of "creating an index and using that index to search for and retrieve data." *Id.*

at 1327 (internal quotations and citation omitted).  The court explained that "organizing and accessing records through the creation of an index-searchable database [] includes longstanding conduct that existed well before the advent of computers and the Internet."  *Id.*  Importantly, as the Federal Circuit explained in *Data Engine*, the claims in *Erie Indemnity Co.* "did not recite any specific structure or improvement of computer functionality sufficient to render the claims not abstract."  *Data Engine*, 906 F.3d at 1010.

The concept of a chat session independent of a pre-existing chatroom is not the solution to a technological problem or an improvement in the functioning of computers, computer software, or computer networks.  It is more akin to the claim in *Erie Indemnity Co.,* which was directed to the use of an index to search for and retrieve data, a function that was held to be an unpatentable abstract idea.  The *Core Wireless* line of cases thus does not support Epic's argument that its claims are directed not to abstract ideas, but to improvements in computer functionality.

In sum, contrary to Epic's argument, this is not a case in which the invention consists of an improvement to the functioning of a computer or network.  Accordingly, the Court concludes that in light of the principles that guide the analysis of the "abstract idea" step of the section 101 inquiry, the asserted claims in this case are directed to abstract ideas.

## II.  Inventive Concept

Turning to the second step of the *Alice/Mayo* test for patent eligibility, Epic argues that, even if the claims are directed to abstract ideas, the claims contain an "inventive concept" that renders them patent-eligible.  Dkt. No. 27, at 18–20.

**A.  Governing Principles**

The "inventive concept" step requires the court to determine whether the claims recite an element or combination of elements that is sufficient to ensure that the patent claims "significantly more" than the ineligible concept itself.  *Alice*, 134 S. Ct. at 2355; *Mayo*, 566 U.S. at 72–73.  As the Supreme Court explained in *Alice*, the court at the second step of the inquiry looks to see whether there are any "additional features" that constitute an inventive concept that would render the claims eligible for patenting even if they were determined to be directed to an abstract idea.  *Alice*, 134 S. Ct. at 2357; *see also Erie Indemnity Co.*, 850 F.3d at 1328.  The *Alice* Court explained that no such "inventive concept" would be found if the "additional features" were "merely well-understood, routine, and conventional activities."  *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 566 U.S. at 73).  Epic contends that the claims at issue in this case contain such additional features.

On this issue, the Federal Circuit's decision in *Electric Power Group* is highly instructive.  The court in that case first determined that the claims before it were directed to an abstract idea.  Upon scrutinizing the claim elements "more microscopically," the court then found "nothing sufficient to remove the claims from the class of subject matter ineligible for patenting."  830 F.3d at 1354.  The court pointed out that "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas."  *Id.* at 1355.  In language that is equally applicable here, the *Electric Power Group* court added that the claims there at issue "do not require an arguably inventive set of components or methods, such as measurement devices or techniques."  *Id.*  The court added:

> Inquiry therefore must turn to any requirements for *how* the desired result is achieved. But in this case the claims' invocation of computers, networks, and displays does not transform the claimed subject matter into patent-eligible applications. The claims at issue do not require any nonconventional computer, network, or display components, or even a "non-conventional and non-generic arrangement of known, conventional pieces" . . . .
>
> Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information.

*Id.* (quoting *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349–52 (Fed. Cir. 2016)).

### B. Applying Those Principles to This Case

The same analysis that the Federal Circuit applied in *Electric Power Group* applies here. As in *Electric Power Group*, the asserted claims do not require any non-conventional computer, network, or even a non-conventional and non-generic arrangement of known, conventional pieces. Rather, the claims merely call for the initiation of a chat session that is separate from any previously established chat room, by use of a set of generic computer components and display devices. Thus, like the claims in *Electric Power Group*, the asserted claims in this case do not recite an inventive concept.

To support its contention that the claims satisfy the "inventive concept" requirement, Epic points to the invention generally. Epic contends that the inventive concept is that the '599 claims "are directed to chat sessions that are dynamically formed by the user through an information page and are not affiliated with pre-established chat rooms." Dkt. No. 27, at 19. According to Epic, this is a significant improvement over prior art chat sessions because the prior art chat rooms "were required to be pre-established and often required pre-registration and chatting only at specified times." *Id.*

Epic's argument amounts to saying that the inventive concept resides in the invention itself, as a whole. But the Federal Circuit has explicitly rejected that approach to the "inventive concept" element of section 101 analysis. In *BSG*, the court explained that an inventive concept must "ensure[] the patent amounts to 'significantly more' than a patent upon the [ineligible concept] itself." *BSG*, 899 F.3d at 1289–90 (quoting *Alice*, 134 S. Ct. at 2355). The court added that "[i]t has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *Id.* at 1290; *see also Erie Indemnity Co.*, 850 F.3d at 1328 ("In applying step two of the *Alice* analysis, we must 'determine whether the claims do significantly more than simply describe [the] abstract method' and thus transform the abstract idea into patentable subject matter.") (quoting *Ultramercial*, 772 F.3d at 715).

As for Epic's argument that, prior to the invention, individuals could not join chat sessions that were unaffiliated with an pre-existing chat room, that argument amounts to saying that the invention, even if directed to an abstract idea, is nonetheless novel and therefore should be patent-eligible. But novelty and patent eligibility are different things. Even if it is true, as Epic asserts, that the systems that were previously used to form chat rooms were more restrictive than Epic's conception, that is not enough to satisfy the "inventive concept" requirement.

The Supreme Court has made this point clear, holding that an abstract idea may be new, but nonetheless unpatentable under section 101. *See Mayo*, 566 U.S. at 90 ("We recognize that, in evaluating the significance of additional steps, the § 101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap. But that need not always be so."); *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981) ("The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls

within the § 101 categories of possible patentable subject matter."); *see also Data Engine*, 906 F.3d at 1011 ("The eligibility question is not whether anyone has ever used tabs to organize information. That question is one of novelty reserved for §§ 102 and 103. The question of abstraction is whether the claim is 'directed to' the abstract idea itself."); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d at 1163 ("We may assume that the techniques claimed are '[g]roundbreaking, innovative, or even brilliant,' but that is not enough for eligibility.") (citation omitted); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a *new* abstract idea is still an abstract idea."); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016) ("While the claims may not have been anticipated or obvious[,] . . . that does not suggest that the idea of 'determining' and 'outputting' is not abstract, much less that its implementation is not routine and conventional.") (citation omitted); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1376 (Fed. Cir. 2016) ("That is, under the *Mayo/Alice* framework, a claim directed to a newly discovered law of nature (or natural phenomenon or abstract idea) cannot rely on the novelty of that discovery for the inventive concept necessary for patent eligibility; instead, the application must provide something inventive, beyond mere 'well-understood, routine, conventional activity.'") (quoting *Mayo*, 556 U.S. at 73). As the Federal Circuit put it in *SAP America*, it is not enough "for subject-matter eligibility that claimed techniques be novel and nonobvious in light of prior art, passing muster under 35 U.S.C. §§ 102 and 103." *SAP America*, 898 F.3d at 1163.[1]

---

[1] Epic argues (Dkt. No. 27, at 8) that during prosecution of the '599 patent, the examiner initially rejected the claims based on a prior art reference to Tang, which disclosed initiating a chat session with another user associated with an information page. The examiner, however, withdrew the rejection when the applicants amended the claims to clarify that the term "chat session" in the application referred to chat sessions that were unaffiliated with any pre-established chat rooms. While that course of events may indicate that the examiner ultimately

The problem with the '599 patent, for purposes of the "inventive concept" requirement, begins with the fact that the limitations are expressed through functional terms lacking in specificity or through generic structures described at a very high level of generality. As the Supreme Court said in *Alice*, "transformation into a patent-eligible application requires 'more than simply stat[ing] the [abstract idea] while adding the words "apply it."'" 134 S. Ct. at 2357 (quoting *Mayo*, 566 U.S. at 72). Claims that "merely recite the method of implementing the abstract idea itself . . . fail under *Alice* step two." *Data Engine*, 906 F.3d at 1012.

Nor does the application of such conventional elements to a specific field, such as generating a chat session over the Internet, convert the conventional elements into an "inventive concept." It is well established that patent-ineligible subject matter does not become patent-eligible merely by being applied in a particular technological environment. *Alice*, 134 S. Ct. at 2358 (The "prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment."); *Bilski*, 561 U.S. at 612 ("limiting an abstract idea to one field of use or adding token postsolution components [does] not make the concept patentable"); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d at 1355 ("narrowing of such long-familiar commercial transactions does not make the idea non-abstract for section 101 purposes"); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d at 1319 ("performing otherwise abstract activity on the Internet does not save the idea from being patent-ineligible."). Thus, the functional limitation of "facilitating dynamic formation of a chat session unaffiliated with any pre-established chat room" for two users to chat with each other does not constitute an "inventive concept."

---

agreed that the application was not anticipated by the prior art reference, it does not speak to the question of patent eligibility which, as noted above, is a separate issue from anticipation.

Epic contends (Dkt. No. 27, at 18) that Backblaze has "limited its analysis to claim 1" and therefore "does not challenge" that claims 2-4 and 19 are patentable under the second step of the *Alice/Mayo* inquiry. That is incorrect. Backblaze argues that claim 1 is representative of the other asserted claims for this purpose, *see* Dkt. No. 23, at 8, and thus it has preserved its "inventive concept" argument as to all of the asserted claims. Setting aside Epic's waiver argument, we agree with Backblaze that dependent claims 2-4 and independent claim 19 fail to recite any inventive concept, for the same reasons that apply to claim 1.

As for the dependent claims, the courts have made clear that adding a degree of particularity through additional limitations does not render dependent claims patent-eligible if the additional limitations merely add further insignificant details and do not convert otherwise patent-ineligible subject matter into a patent-eligible invention. *See Affinity Labs*, 838 F.3d at 1264 (dependent claims all recited functions that were not inventive but simply constituted "particular choices from within the range of existing content or hardware"); *Internet Patents*, 790 F.3d at 1349 (additional limitations of the dependent claims held not to add an inventive concept, for "they represent merely generic data collection steps or siting the ineligible concept in a particular technological environment"); *Content Extraction*, 776 F.3d at 1349 (dependent claims did not add any inventive concepts, but merely recited routine and conventional functions of scanners and computers).

While dependent claims can be patent-eligible even when their corresponding independent claims are patent-ineligible, *see, e.g., Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), that is not the case here. As noted above, dependent claims 2 and 3 of the '599 patent contribute nothing of substance that is not implicit in claim 1, and dependent claim 4 merely adds a "dialog panel" by which the user can describe himself. None of those dependent claims

can fairly be said to contain an inventive concept that contains "significantly more" than the ineligible concept itself. *Alice*, 134 S. Ct. at 2355.

Claim 19 likewise contains nothing of substance beyond what is contained in claim 1, as noted above. The "information page" on which the option to form a chat session is presented to the user and the generic "script/applet" that enables the user to initiate formation of the chat session, are described in the specification as "conventional." *See* '599 patent, col. 5, ll. 38-41; *see also id.*, col. 6, ll. 16-18 (script/applet described as "implemented using any one of a number of programming languages"). Given that the components set forth in the dependent claims as well as in claims 1 and 19 are identified in the specification as conventional, and the operations recited in the claims are the kinds of operations that are routinely performed by computers in a network system, the Court concludes that none of the asserted claims recite any computer function that is not "well-understood, routine, and conventional." Thus, nothing in the five asserted claims qualifies as an "inventive concept" that would rescue the claim from ineligibility as an abstract idea.

## III. The Appropriateness of Resolving This Case on a Motion to Dismiss

Prior to the hearing on the motion to dismiss, the Court asked the parties to address what factual issues might be presented by the issues raised in the motion that would preclude addressing the patent-eligibility issue on a motion to dismiss. The Court raised that question in light of the recent Federal Circuit decisions in *Berkheimer v. HP Inc.*, *supra*, and *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018), which held that the question whether a claim is directed to subject matter that is "well-understood, routine, and conventional" for purposes of the "inventive concept" inquiry can sometimes raise issues of fact that would preclude dismissal under Rule 12(b)(6). The Court also asked the parties to address

the question whether there were any potential claim construction issues that could make disposition of the case on a Rule 12(b)(6) motion inappropriate.

The parties addressed both of those issues at the hearing. Having heard the parties out on those issues, the Court has concluded that there are no factual issues that would preclude entry of judgment under Rule 12(b)(6) and no claim construction issues that would require the Court to await claim construction before determining whether the plaintiff's claims are patent-eligible.

With regard to factual issues, the *Berkheimer* and *Aatrix* cases do not stand for the proposition that a plaintiff can avoid dismissal simply by reciting in the complaint that the invention at issue is novel. As discussed above, section 101 does not turn on novelty, and thus the fact that Epic's apparatus may have been unconventional in providing for chat sessions unaffiliated with a pre-established chat room does not mean that the claims necessarily incorporate an "inventive concept." Moreover, as Judge Moore explained in her opinion concurring in the orders denying rehearing en banc in the *Aatrix* and *Berkheimer* cases, 890 F.3d 1354, 1359 (Fed. Cir. 2018), and 890 F.3d 1369, 1374 (Fed. Cir. 2018), it is "clear from *Mayo* that the 'inventive concept' cannot be the abstract idea itself, and *Berkheimer* and *Aatrix* leave untouched the numerous cases from this court which have held claims ineligible because the only alleged 'inventive concept' is the abstract idea."

District courts have frequently decided section 101 issues on motions to dismiss, and the Federal Circuit has approved of that procedure on numerous occasions, including in cases post-dating the decisions in *Aatrix* and *Berkheimer*. *See, e.g., SAP Am., Inc.*, 898 F.3d at 1166 (citing cases); *Berkheimer*, 881 F.3d at 1368 ("Patent eligibility has in many cases been resolved on motions to dismiss or summary judgment. Nothing in this decision should be viewed as casting doubt on the propriety of those cases."); *Voter Verified, Inc. v. Election Sys. & Software LLC*,

887 F.3d 1376, 1385 (Fed. Cir. 2018); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced.") (citing cases).

In this case, as stated above, Epic's general position with respect to the "inventive concept" step of the *Alice/Mayo* inquiry is that the combination of elements recited in each of the asserted claims amounts to an inventive concept. That is, the assertedly "inventive concept" is the abstract idea itself. As noted, however, the "inventive concept" element of the section 101 analysis requires "significantly more" than the abstract idea itself. At the hearing, Epic asserted that the fact issues with respect to claims 1-4 of the '599 patent are whether the limitations of each of those claims would be well-understood, routine, or conventional to a skilled artisan. But that is merely asking whether the claim as a whole is the inventive concept. With respect to claim 19, Epic asserted that the fact issue is whether the components of the second limitation of that claim would be well-understood, routine, or conventional to a skilled artisan. That, again, is just another way of asking whether the claimed invention as a whole would be well-understood, routine, or conventional. Asking about the second limitation amounts to asking about the whole invention because the first limitation of claim 19 (the only other limitation of the claim) recites a server providing information pages to a client computer in response to the client computer's request. That limitation describes the most fundamental service provided by a website and merely sets the background for the second limitation in claim 19. Because Epic has not suggested that there is a factual issue as to whether the asserted claims are directed to something significantly more than the abstract idea itself, Epic has failed to point to a discrete factual issue on which the presence of an "inventive concept" in claim 19 would turn.

As to claim construction, the Federal Circuit has addressed the question whether a motion to dismiss under section 101 can be decided before claim construction. The court has held that a district court may do so if the nature of the claims is clear and it is apparent that claim construction would not affect the patent-eligibility of the claims at issue. *See Genetic Techs. Ltd.*, 818 F.3d at 1374; *buySAFE, Inc.*, 765 F.3d at 1355; *Bancorp Servs. L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012); *see generally Aatrix Software, Inc.*, 882 F.3d at 1128 (leaving undecided whether claim construction was required before the district court granted the motion to dismiss); *CyberFone*, 558 F. App'x 988, 992 n.1 (Fed. Cir. 2014) ("There is no requirement that the district court engage in claim construction before deciding § 101 eligibility.").

Epic has not pointed to any claim construction issue that would alter the Court's judgment as to the disposition of the section 101 motion. The claims are straightforward and not technical in nature, and plaintiff's counsel has not pointed to any terms from the asserted claims that would likely give rise to a material dispute over claim construction. At the hearing, counsel contended that the phrase "facilitating dynamic formation of a chat session" in claim 1 should be construed to mean "providing a script/applet that is included with an information page to initiate the dynamic formation of the unaffiliated chat session through a chat session manager." The Court finds Epic's proposed construction to be questionable, as it imports subject matter from an embodiment in the specification and disregards the breadth of the term "facilitating" in claim 1. Nonetheless, even if claim 1 were construed as Epic suggests, the result of the section 101 analysis would be the same, since the effect of that claim construction would simply be to make the method of claim 1 congruent with the apparatus of claim 19, which the Court has also found to be patent-ineligible.

Accordingly, the Court believes it is both feasible and appropriate to decide the section 101 issue now and spare the parties the burdens that would be incurred in delaying disposition of the section 101 issue until after claim construction and summary judgment proceedings, or beyond. Based on the foregoing analysis, the Court holds that claims 1-4 and 19 of the '599 patent are not patent-eligible and therefore grants the defendant's motion to dismiss.

IT IS SO ORDERED.

SIGNED this 21st day of November, 2018.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE